HARRIET McALLISTER v. GEORGE W. PRYOR, VIRGINIA-CAROLINA AMUSEMENT COMPANY AND SOUTHERN PUBLIC UTILITIES COMPANY.

(Filed 31 May, 1924.)

**1. Negligence—Electricity.**

There is nothing by which the user of an electrical appliance can detect the presence of an unusual high voltage or deadliness of current before touching the wire or coming in contact with it, and the greatest degree of care is required of those furnishing this deadly instrumentality to guard against the danger of its ordinary use as the circumstances may require. C. S., 2763, 2764, 2766.

**2. Same—Evidence—Res Ipsa Loquitur—Nonsuit—Questions for Jury.**

Where the furnisher of electricity for a building was, under its contract with the owner, required to furnish a low voltage of electricity for lighting and various domestic uses, and there is evidence tending to show that in attempting to iron clothes within the building with an electric iron the plaintiff touched the ironer and received a severe shock of elec-

tricity, to her injury, which should not and would not ordinarily have occurred by such use had the defendant supplied the current it had contracted to do, the doctrine of *res ipsa loquitur* applies, and the issue of actionable negligence should be submitted to the jury, denying defendant's motion as of nonsuit thereon.

APPEAL by plaintiff from *Harding, J.,* at November Term, 1923, of MECKLENBURG.

This is a civil action. From judgment of nonsuit, plaintiff appeals. Reversed.

The plaintiff conceded in this Court that on the evidence adduced in the court below there was no error in the judgment of nonsuit against Geo. W. Pryor and Virginia-Carolina Amusement Company. The only question that will be considered: Is there any sufficient evidence, as shown from the record, to go to the jury, as to the liability of the Southern Public Utilities Company.

The plaintiff contends that the defendant, Virginia-Carolina Amusement Company, was a corporation operating theatres and places of amusement in Virginia and North Carolina, and George W. Pryor was one of the owners and managers. That they were operating what is known as the "Piedmont Theatre" in the city of Charlotte. The plaintiff was an actress and engaged as a performer, and it was her duty to press her aprons, used as a part of her costume, to be worn during the performance, and to press wardrobes. She was furnished with an electric iron for this purpose and was injured as hereinafter stated.

The plaintiff alleges in the complaint: "That the defendant, Southern Public Utilities Company, was negligent, which negligence was the proximate cause of the injury to the plaintiff, in that it failed to properly inspect its said system of wiring, appurtenances and equipment whereby the current was transmitted to the said theatre, as aforesaid, and in permitting the said wiring, appurtenances and equipment to become in such defective condition and such condition that it failed to perform the function for which it was installed in controlling and reducing the current and the voltage, quantity or power of said current which was transmitted to the said building in such low voltage, quantity or power as to be proper and safe for uses in said building; and in negligently permitting the said current to be transmitted to said Piedmont Theatre and its wiring system and equipment in such high voltage, quantity and power as to make it unsafe for persons to use and handle the equipment of said theatre, in the manner in which they were accustomed ordinarily to handle the same; and this said negligence produced the injury to the plaintiff in that the said current of electricity was transmitted to the iron which she · was handling, as aforesaid, in' a dangerous, unsafe and unusual quantity, voltage and power."

53—187

The Southern Public Utilities Company deny these allegations.

From the judgment of nonsuit rendered against plaintiff in the court below she assigns error, and appeals to the Supreme Court.

*J. F. Flowers* for plaintiff.

*Cook & Wyllie* for Geo. W. Pryor and Virginia-Carolina Amusement Company.

*W. S. O'B. Robinson, Jr., and R. S. Hutchinson* for Southern Public Utilities Company.

CLARKSON, J.   Upon a motion as of nonsuit upon the evidence, the evidence must be considered in the light most favorable to the plaintiff.

The plaintiff testified: "The iron was connected by the electrician of the house.   When I took hold of the iron I started getting a severe shock.   I found I was grounded both feet, and I could not release the iron, and I immediately started screaming for help.   The electrician came and he rushed up to the socket and tried to turn it off; when he touched the socket it began sputtering and started spitting little flames and knocked him over against the dressing-room.   He ran up stairs to the switchboard; at that time in the Piedmont Theatre they had a switchboard with all the switches on it, and he tried to relieve me from the iron by throwing the lever.   All the time I was grounded, and I was getting this full shock.   This whole side of my right arm, my right side and my right limbs had given away.   It was going up into my heart and I thought any moment I was going to meet death, and I started screaming.   He shouted to the operator to cut it off, but I have been told since that the operator was deaf and dumb, and of course he could not hear the electrician, and then the electrician ran to the front of the house.   I can't say just how the current was cut off; when I was released I fainted and was unconscious.   I was taken over to the doctor's, and there I suffered shock and chills, and I found my finger had been severely burned.   I was then taken over to my hotel, or rooming house, and there I suffered shock and chills, and it has been a wreck to my system ever since.   I have been in a terrible condition and I can hardly use my right arm and right hand in cold weather, and I have a spasmodic condition left in my right arm and hand—it quivers all the time; I have very little use of it.   I carried my hand in a sling for 18 weeks, and as a result of this injury I have just the same feeling in my hand as you would have in your foot when it has been asleep.   It is a-tingle, and, as I say, a spasmodic condition of tingling, and it is very painful in cold weather.   Sometimes I can scarcely move my arms. It was customary at the Piedmont Theatre at that time for members of the company to press a wardrobe in the theatre at each change of the

bill. The pressing was done by an electric iron, and this particular week the electric iron was connected just on the entrance of the stage door. The connection was customarily made to the light socket, and this connection of the iron to the socket was made by an electrician on the day I was injured. He was supposed to be, to the best of my knowledge, in charge of the electric apparatus of the Piedmont Theatre. He was the man who had actual charge of the switchboard in the theatre. He said it would be all right to press and that he would connect the iron for me; for me to get the sheet on which I wanted to iron and use the table that he had put below the socket. I used the table and received the injury at that table immediately. It was when I started to take hold of the iron; of course after he connected it the iron was left to heat, but it was upon my taking hold of the iron."

The measure of care required is stated in 20 C. J., p. 341, sec. 36, as follows: "The measure or degree of care required of electric companies is variously stated—as usual and ordinary care; reasonable care; such care as a reasonably prudent man would exercise under the circumstances; care commensurate with or proportionate to the danger; high degree of diligence and foresight; all that human care, vigilance and foresight can reasonably do; all the foresight and caution which can be reasonably expected of men under similar circumstances; every protection accessible to prevent danger; the utmost degree of care; a high degree of care; a very high degree of care; the highest degree of care which skill and foresight can obtain, consistent with the practical conduct of their business under the known methods and present state of the particular art; the care required to prevent injury; such care and caution as to protect the public, and especially those who might be called upon to come near or in contact with wires, from dangers they could not see and which they might readily overlook. Reasonable care does not require such precautions as will absolutely prevent injury or render accidents impossible. By utmost care and skill is meant the highest degree of care and skill known which may be used under the same or similar circumstances. One using electric currents must take into account the acts of strangers and of the public generally."

Electric appliances are becoming more in use each day. The old methods are giving way to the new. These appliances are used for ironing, cooking, washing, heating, etc. The North and South Carolina Public Utility Information Bureau states that there are now some 52 electric appliances that can be used in the home and elsewhere, such as electric ranges, bake ovens, sewing machine motors, washing machines, churns, disk stoves, dish washers, fireless cookers, fans, grills, ironing machines, etc. Many new uses will yet be discovered. These appliances can be purchased at all the leading electric power stores. These

appliances have been of great benefit and use, saving of time and money, to the women in the homes and in other places. Electricity is recognized as an invisible force, subtle, with dangerous characteristics. It is important to encourage the use of the electric appliances, but it is necessary that this invisible and subtle force shall be carefully guarded. With this knowledge of danger, the National Fire Protection Association, in 1923, recommended a "National Electric Code," known as "Regulations of the National Board of Fire Underwriters for Electric Wiring and Apparatus." It covers the entire electric territory, including heating appliances.

C. S., 2763, is as follows: "The electric wiring of houses or buildings for lighting or for other purposes shall conform to the regulations prescribed by the organization known as the National Board of Fire Underwriters. In order to protect the property of citizens from the dangers incident to the defective electric wiring of buildings, it shall be unlawful for any firm or corporation to allow any electric current for the purpose of illuminating any building belonging to any person, firm, or corporation to be turned on without first having had an inspection made of the wiring by the building inspector, and having received from the inspector a certificate approving the wiring of such building. It shall be unlawful for any person, firm or corporation engaged in the business of selling electricity to furnish any electric current for use for illuminating purposes in any building or buildings of any person, firm or corporation, unless the said building or buildings have first been inspected by the inspector of buildings and a certificate given as above provided. The fee that shall be allowed said inspector of buildings for the work of such inspection of electric wiring shall be one dollar for each building inspected, to be paid by the person applying for the inspection."

C. S., 2764, provides for quarterly inspection of buildings in the fire limits. C. S., 2765, provides for annual inspection of all buildings in corporate limits. C. S., 2766, provides for record of inspection.

The State has an electrical inspector. The cities of the State have city electricians and ordinances requiring persons to be examined and licensed touching their electrical knowledge and ability before they can follow this calling. These electric ordinances in sundry and divers ways make regulations for safety. The Southern Public Utilities Company, under the authority given it, produces and sells electricity as a commercial product. Being engaged in the manufacture and handling of so dangerous a commodity as electricity, it is important that the public, which buys and uses this commodity, know and have confidence that in the distribution of this invisible and subtle power in the home and elsewhere the supply will be safe and convenient in form for domestic

and other purposes, and that every reasonable safeguard will be provided against danger. In the distribution it must be held to the highest degree of care.

The Southern Public · Utilities Company, in its brief, contends: "Neither the allegations of the plaintiff's complaint nor her evidence bring her case within the doctrine of *res ipsa loquitur,* so as to give rise to any inference of negligence against the defendant, Southern Public Utilities Company. The plaintiff relies upon the doctrine of *res ipsa loquitur* as declared and applied in the cases of *Turner v. Power Co.,* 154 N. C., 131; *Shaw v. Public Ser. Co.,* 168 N. C., 611. The defendant, Southern Public Utilities Company, also relies upon these two cases."

From the allegations of the complaint and evidence of the plaintiff, we think the evidence is sufficient to be submitted to the jury under the *Turner* and *Shaw cases, supra.*

In the *Turner case* the charge of the court below, which was approved, is as follows: "That while the law does not regard an electric light company an insurer against injury, such a company owes to its patrons the duty to protect them from injury by exercising the highest skill, most consummate care and caution, and the utmost diligence and foresight in the construction, maintenance and inspection of its plant and appliances obtainable, consistent with the practical operation of its plant. So it is something more, under the law, as the court understands it, than ordinary care; it is the highest care."

*Hoke, J.,* in the *Turner case, supra,* at p. 137, said: "The presiding judge charged the jury that if the injuries resulted by reason of defective apparatus or appliances existent within the building, they would render their verdict for defendants, and in effect excluded from the consideration of the jury any and all imputation of wrong except that which might arise by reason of an excess of voltage transmitted into the building over the wires of defendants, and by reason of negligent default on the part of the company or their agents. This being true, on the facts in evidence, the case permits and calls for an application of the doctrine of *res ipsa loquitur,* and requires that the question of defendant's responsibility should be determined by the jury. This doctrine has been discussed and applied in several recent cases before this Court, as in *Dail v. Taylor,* 151 N. C., 284; *Fitzgerald v. R. R.,* 141 N. C., 530; *Ross v. Cotton Mills,* 140 N. C., 115; *Stewart v. Carpet Co.,* 138 N. C., 66; *Womble v. Grocery Co.,* 135 N. C., 474."

*Walker, J.,* in the *Shaw case, supra,* p. 617, quotes with approval from *Mitchell v. Electric Co.,* 129 N. C., 169, as follows: "The defendant company was engaged in the business of manufacturing, producing, leasing, and selling light made from the use of electricity, which is the

most deadly and dangerous power recognized as a necessary agency in developing our civilization and promoting our comfort and business affairs. It differs from all other dangerous utilities. Its association is with the most inoffensive and harmless piece of mechanism, if wire can be classified as such, in common use. In adhering to the wire, it gives no warning or knowledge of its deadly presence; vision cannot detect it; it is without color, motion, or body; latently and without sound it exists, and being odorless, the only means of its discovery lies in the sense of feeling, communicated through the touch, of a person, which, as soon as done, he becomes its victim. In behalf of human life and safety of mankind, it behooves those who would profit by the use of this subtle and violent element of nature to exercise the greatest degree of care and constant vigilance in inspecting and maintaining the wires in perfect condition." The learned judge quotes, on p. 618, further, with approval: "The maxim *res ipsa loquitur* applies in many cases, for the affair speaks for itself. It is not that in any case negligence can be assumed from the mere fact of an accident and an injury, but in these cases the surrounding circumstances which are necessarily brought into view, by showing how the accident occurred, contain without further proof sufficient evidence of the defendant's duty and of his neglect to perform it. The fact of the casualty and the attendant circumstances may themselves furnish all the proof that the injured person is able to offer or that it is necessary to offer. Sh. and Redf. on Neg., sec. 59. The case of *Turner v. Power Co., supra,* seems to be 'on all-fours' with this one, as the facts of the two cases are strikingly alike."

The defendant in its brief quotes as follows from *Smith's Admx. v. Middlesboro Electric Co.,* 174 S. W., p. 780 (Ky.), which we think sound in principle except as modified by statute in this State: "The just rule seems to be that the electric light company should not be responsible for injuries received by persons arising solely from the defects in wiring and appliances used for electric lighting purposes within their own houses, and which are owned by them, and over which they have entire control, and where the only connection between the company and the person using the lights is a contract between them and the company for the company to connect its system with the inside wiring of such parties and to deliver a current for their use, in the absence of knowledge on the part of the company of the defective condition of the wiring and appliances of such parties. In such a state of case the company would not owe such person any duty of inspection of their wiring and appliances. *Although such inside wiring and appliances were defective, this would not excuse the company for injuries arising from its sending*

*into the house a dangerous current of electricity, and without which the defects in the inside wiring and apparatus would have been harmless."* (Italics ours.)

The Kentucky Court, in the same case, at p. 777, lays down the same principle as has been enunciated by this Court: "While an electric light company is not an insurer of the safety of its patrons, nor of people, who may come in contact with its wires and its apparatus while at places at which they have a right to be, and engaged at the performance of things which they have a right to do, it is required to exercise the very highest degree of care and skill in the installation, construction and operation of its plant, and the highest degree of care and skill in the inspection of its wires and appliances and all of its apparatus to prevent injury to persons, and to that end should provide itself with and use the known necessary devices to control its electrical current, and prevent the passing of dangerous currents of electricity into the houses of its patrons, because the patrons of such a company and the persons on lawful business in the houses of the patrons have a right to assume, in the absence of knowledge to the contrary, *that the appliances and fixtures of the company are free from defects which would permit the flow of an unnecessary and dangerous current of electricity into the houses, endangering their lives or safety.* (Italics ours.) . . . The nature of electricity and its operations and what it may do or may not do are things very little understood or known by the masses of the people, and are subjects about which those professing the greatest knowledge of electricity and the effects of it under circumstances dispute. It cannot be seen, and can only be felt, and when the effects of it are felt, it is usually too late for the victim to escape its more deadly effects. The suddenness and destructiveness of its effects are such that those who choose to manufacture and distribute it, although it is a lawful and now almost a necessary business, must be held to the highest degree of care in its distribution."

The extent of the plaintiff's injury, if believed, would indicate an unnecessary and dangerous current of electricity into the theatre, an excess of voltage transmitted. The doctrine of *res ipsa loquitur* applies, which would carry the case to the jury. *White v. Hines,* 182 N. C., 288; *Modlin v. Simmons,* 183 N. C., 65; *Hinnant v. Power Co., ante,* 293.

The judgment of nonsuit as to Geo. W. Pryor and Virginia-Carolina Amusement Company is affirmed. From the view we take of the law, we think the case against the Southern Public Utilities Company should have been submitted to a jury.

For the reasons given, the judgment below is

Reversed.