**UNITED STATES**

v.

**FIRST–CITIZENS BANK & TRUST CO. (three cases).**

**UNITED STATES v. LIVESAY.**

**UNITED STATES v. WILSON et al.**

Nos. 6654–6658.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 20, 1953.

Decided Nov. 9, 1953.

Thomas F. Ellis, Asst. U. S. Atty., and Charles P. Green, U. S. Atty., Raleigh, N. C., for appellant.

R. E. Whitehurst, New Bern, N. C., George H. McNeill, Morehead City, N. C., William E. Rollow, Washington, D. C., and George B. Riddle, Jr., New Bern, N. C. (Hamilton & McNeill, Morehead City, N. C., Walter E. Hoffman, Norfolk, Va., Hugh T. Fullerton and Pillsbury, Madison & Sutro, Washington, D. C., on brief), for appellees.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and WILKIN, District Judge.

PARKER, Chief Judge.

These are appeals in five cases brought under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., and heard together in the court below. They were brought to recover damages on account of the death of three persons and the injury of three others which resulted from the collision of an automobile driven by Commander Dave Johnston, Jr., with a United States Marine Corps wrecker

which had been left standing unlighted on a highway in the night time. From judgments in favor of the plaintiffs in all five of the cases the United States has appealed asking reversal on the ground that the negligence of Commander Johnston in failing to see and avoid the wrecker was the sole proximate cause of the disaster. The facts, as to which there is little dispute are thus stated by the trial judge in his memorandum:

"The collision occurred at about 12:30 a. m. on N. C. Highway between Swansboro and Bogue in fair weather. In the car operated by Commander Johnston were his wife, Anne Johnston, Dr. John D. Wilson, a Navy Lieutenant (Junior Grade), Mrs. Nancy E. Wilson, his wife, Franklin Carter Livesay, a Navy Lieutenant, and Mrs. Frances M. Livesay, his wife. The Naval officers, Johnston, Wilson and Livesay, were on leave from their ship, which was in harbor at Morehead City, N. C., and the party was returning to Morehead City from Camp LeJeune, proceeding in an easterly direction, when the accident occurred. The Marine Corps wrecker, driven by Christafaro, with Trammell as passenger, had been on its way from LeJeune to Morehead City, also proceeding easterly, when about thirty minutes before the accident, due to engine trouble or mechanical defect, it became necessary for the operators to stop it in the right-hand (south) lane of the highway. The marines in charge did their utmost to get the wrecker off the hard surface portion of the highway, but were unable to do so, and at the moment of impact the wrecker's rear dual wheels were located a foot or two to the right (south) of the center line of the highway, almost completely blocking the right-hand lane and the path of Johnston's automobile. The wrecker was equipped with lights as follows: two headlights, two tail-lights, two spot lights mounted on the cab facing to the rear, and two blackout lights. All lights were in good working condition and were operated by switches —but none of the lights was burning at the time of the collision and for a period before. No flares or lanterns were displayed to the rear.

"The highway was surfaced with dull black asphalt, twenty-two feet in width; the roadway was not lighted, but it was a moonlight night and the visibility was good; the surface of the highway was dry; there was no curve in the road which might have affected the view of Commander Johnston; along the south side of the hard surface for several hundred yards both to the east and to the west of the wrecker there was a level shoulder about ten feet in width; the wrecker was painted olive drab and the rear axle housing was covered with grease and dust; the wrecker's tires were black; it was not equipped with rear reflectors.

"While being operated by Commander Johnston at a lawful and reasonable rate of speed on the proper (south) side of the highway, with proper headlights burning, the automobile collided with the stalled or stationary wrecker, the front of the automobile striking the rear end of the wrecker and causing the injuries and deaths in question. As the Johnston automobile approached the wrecker from the west, a second automobile approached from the east at about the same relative distance from the wrecker, but this automobile came to a stop about 75 yards before reaching it, and the head lights dimmed.

"The Johnston car was entirely under his control and no one of the passengers had any part in or control over the manner or way in which he drove. All six occupants suffered personal injuries, and Commander Johnston, his wife, Anne Johnston, and Frances M. Livesay died as a re-

sult of their injuries." [112 F. Supp. 116.]

To this it should be added that the wrecker, the body of which stood about four feet above the ground, was stopped a little to the east of the low point in a slight dip or depression in the highway; that the Johnston car was approaching from the west down an incline and with its lights turned down; and that the lights had been turned down as the result of signals exchanged between it and the car approaching from the east. With respect to the charge of negligence on the part of Johnston, the judge made the following finding:

"I do not find, either as a matter of law or fact, that he (Johnston) failed to exercise the care of a person of ordinary prudence. It is plain, of course, that the facts in each case present a question unique to that particular case. In the case of Morgan v. Cook, (236 N.C. 477, 73 S.E.2d 296) as well as in some of the other cases of like import, it appeared affirmatively that the driver continued to drive for some substantial time after being blinded by the lights of an oncoming vehicle. Here, the driver was killed in the accident and there is no evidence on this question. It is reasonable to believe that Johnston failed to see the wrecker in time, but whether such failure was due to the lights of the approaching automobile, or to some other cause beyond his control, in the exercise of due care, cannot be determined. It seems to me that it would be pure speculation to say that there was a failure to use due care on the part of Johnston."

■■ There can be no question, of course, as to the negligence of those in charge of the wrecker, who left it standing on the highway in the night time without the lights and warning signals required by the North Carolina statutes, chapter 20 General Statutes of North Carolina sections 134 and 161. It is equally clear that such negligence must be deemed the proximate cause of the wreck and the resulting injuries and deaths of those riding in the car, unless the sole proximate cause is to be found in the negligence of Commander Johnston; and there is nothing in the record which would justify our disturbing the findings of the trial judge to the effect that he was not guilty of negligence. He evidently did not see the wrecker, which had been negligently stopped upon the highway without displaying the lights and warning signals which the law requires. The wrecker had been painted olive drab for the express purpose of escaping observation in the night time; and the deflection of the lights of Johnston's car combined with the fact that it was coming down an incline probably prevented their shining upon the body of the wrecker. That Johnston was not driving carelessly is shown by the fact that he signaled to the car approaching from the opposite direction to dim its lights. Whether under all the circumstances he should have seen the wrecker in the exercise of due care, or whether his failure to see it was excusable in view of the fact that his lights were turned down so that they would not shine upon the wrecker, the body of which stood four feet above the road, and that his attention was doubtless diverted to some extent by the car which was approaching from the east, was a pure question of fact and we cannot say that the answer given it by the trial judge was wrong.

■ The government relies on decisions of the Supreme Court of North Carolina which lay down the rule that "it is negligence as a matter of law to drive an automobile along a public highway in the dark at such speed that it cannot be stopped within the distance that objects can be seen ahead of it", commonly known as the rule of "outrunning headlights". See Weston v. Southern Ry. Co., 194 N.C. 210, 139 S.E. 237, 238; Allen v. Dr. Pepper Bottling Co., 223 N.C. 118, 25 S.E.2d 388; Parkway Bus Co. v. Coble Dairy Products

Co., 229 N.C. 352, 49 S.E.2d 623. It is easy, however, to press this rule too far. It was never intended to preclude an examination of the alleged negligence of the driver of the car under the rule of reasonable prudence or to provide a bomb proof haven of refuge for one who has left an unlighted death trap upon a public highway in the darkness of the night. Recent decisions of the North Carolina Supreme Court point out very clearly that contributory negligence in cases of this sort is to be judged by the rule of reasonable prudence under all the circumstances of the case and not by arbitrary rule of thumb. In the case of Thomas v. Thurston Motor Lines, 230 N.C. 122, 52 S.E.2d 377, 383, Mr. Justice Ervin, speaking for the Supreme Court, enunciated the rule as now recognized in North Carolina as follows:

"Few tasks in trial law are more troublesome than that of applying the rule suggested by the foregoing quotation to the facts in particular cases. The difficulty is much enhanced by a tendency of the bench and bar to regard it as a rule of thumb rather than as an effort to express in convenient formula for ready application to a recurring factual situation the basic principle that a person must exercise ordinary care to avoid injury when he undertakes to drive a motor vehicle upon a public highway at night. The rule was phrased to enforce the concept of the law that an injured person ought not to be permitted to shift from himself to another a loss resulting in part at least from his own refusal or failure to see that which is obvious. But it was not designed to require infallibility of the nocturnal motorist, or to preclude him from recovery of compensation for an injury occasioned by collision with an unlighted obstruction whose presence on the highway is not disclosed by his own headlights or by any other available lights. When all is said, each case must be decided according to its own peculiar state of facts. This is true because the true and ultimate test is this: What would a reasonably prudent person have done under the circumstances as they presented themselves to the plaintiff? 1 Blashfield's Cyclopedia of Automobile Law and Practice, Perm.Ed., part 2, §§ 741, 751."

In Chaffin v. Brame, 233 N.C. 377, 64 S.E.2d 276, 279, a unanimous court, speaking through the same justice, said:

"The duty of the nocturnal motorist to exercise ordinary care for his own safety does not extend so far as to require that he must be able to bring his automobile to an immediate stop on the sudden arising of a dangerous situation which he could not reasonably have anticipated. Any such requirement would be tantamount to an adjudication that it is negligence to drive an automobile on a highway in the nighttime at all. The law simply decrees that a person operating a motor vehicle at night must so drive that he can stop his automobile or change its course in time to avoid collision with any obstacle or obstruction whose presence on the highway is reasonably perceivable to him or reasonably expectable by him. It certainly does not require him to see that which is invisible to a person exercising ordinary care.

"It is a well established principle in the law of negligence that a person is not bound to anticipate negligent acts or omissions on the part of others; but in the absence of anything which gives or should give notice to the contrary, he is entitled to assume and to act upon the assumption that every other person will perform his duty and obey the law and that he will not be exposed to danger which can come to him only from the violation of duty or law by such other person. * * *

"When the plaintiff undertook to drive his automobile on the public highway during the nighttime, he had the right to act upon the following assumptions until he had notice to the contrary: (1) That no other motorist would permit a motor vehicle either to move or to stand on the highway without displaying thereon a lamp projecting a red light visible under normal atmospheric conditions from a distance of five hundred feet from its rear, G.S. §§ 20–129(d), 20–134; (2) that the driver of any truck becoming disabled on the highway after sundown would display red flares or lanterns at least two hundred feet to the rear of the disabled truck as a warning to approaching motorists of the impending peril, G.S. § 20–161; and (3) that whenever he met another motor vehicle traveling in the opposite direction, its driver would seasonably dim its headlights and not persist in projecting a glaring light into his eyes, G.S. § 20–181."

All of this is in accord with the rule long ago laid down by this court in Morris v. Sells-Floto Circus, 4 Cir., 65 F.2d 782, 784, where the late Judge Northcott quoted with approval the following passage from Morehouse v. City of Everett, 141 Wash. 399, 252 P. 157, 160, 58 A.L.R. 1482:

"The rule contended for is, in our opinion, entirely too broad, and, if put in effect, would have very serious and unjust results. It loses sight of the fact that one driving at night has, at least, some right to assume that the road ahead of him is safe for travel, unless dangers therein are indicated by the presence of red lights; it does not take into consideration the fact that visibility is different in different atmospheres, and that at one time an object may appear to be 100 feet away, while at another time it will seem to be but half that distance; it fails to consider the honest error of judgment common to all men, particularly in judging distances at night; it loses sight of the fact that the law imposes the duty on all autos traveling at night to carry a red rear light and the duty on all persons who place obstructions on the road to give warning by red lights or otherwise; it fails to take into consideration the glaring headlights of others and the density of the traffic and other like things which may require the instant attention of the driver; it does not take into consideration that a driver at night is looking for a red light to warn him of danger, and not for a dark and unlighted auto or other obstruction in the road. 'We believe that, generally speaking, where the statutes or the decisions of the courts require red lights as a warning of danger on any object in the highway and such lights are not present, it is a question for the jury to determine whether the driver at night should have seen the obstruction, notwithstanding the absence of red lights.' "

Two recent North Carolina cases upon which the government relies and in which it was held that negligence of the driver of the car was established as a matter of law, Morgan v. Cook, 236 N.C. 477, 73 S.E.2d 296, and Godwin v. Nixon, 236 N.C. 632, 74 S.E.2d 24, both involved factual situations not present here; and we think as did the judge below that they are not controlling.

If Johnston was not guilty of negligence it necessarily follows that his fellow passengers in the car are not precluded from recovery on the theory that his negligence insulated the negligence of those in charge of the wrecker. There is nothing in the record to justify a finding that any of his fellow passengers was guilty of contributory negligence.

The judgments appealed from will be affirmed.

Affirmed.